# ORIGINAL

CLERK US DISTRICT COURT
NORTHERN DIST. OF TX
FILED

2017 JAN -9 PM 3: 34

DEPUTY CLERK _____

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

---

UNITED STATES OF AMERICA

v.                                              NO. 3:16-CR-00516-D

KELLY WADE LOTER (07)

## FACTUAL RESUME

**SUPERSEDING**
**INFORMATION:**   Count 1:   18 U.S.C. § 4, misprision of a felony.

**ELEMENTS OF**
**THE OFFENSE:**   In order to establish the crime of misprision of a felony, in violation of 18 U.S.C. § 4, as set out in Count 1 of the superseding information, the Government must prove the following elements beyond a reasonable doubt:

*First*:   A federal felony was committed, namely, Conspiracy to Pay and Receive Health Care Bribes and Kickbacks in violation of 18 U.S.C. § 371;

*Second*:   The defendant had knowledge of the commission of that felony;

*Third*:   The defendant failed to notify an authority as soon as possible.   An "authority" includes a federal judge or some other federal civil or military authority, such as a grand jury, Secret Service, or FBI agent; and

*Fourth*:   The defendant did an affirmative act, as charged, to conceal the crime of Conspiracy to Pay and Receive Health Care Bribes and Kickbacks.

## STIPULATED FACTS:

Loter agrees that the following facts are true and correct and that his testimony at

**Factual Resume – Page 1**

any trial would reflect the same.

From in or around early 2008, through in or about January 2013, in the Dallas Division of the Northern District of Texas and elsewhere, the defendant, Kelly Loter, having knowledge of the actual commission of a felony cognizable by a court of the United States, to wit, Conspiracy to Pay and Receive Health Care Bribes and Kickbacks, did conceal the same.

### PAYMENT OF BRIBES AND KICKBACKS TO DEFENDANTS NICHOLSON, RIMLAWI, WON, AND OTHERS THROUGH LEVEL TWO

Specifically, Loter owned an advertising agency, Level Two, which provided branding and campaign services for a variety of industries, but had little-to-no experience in the health care industry.   An employee of Level Two was friends with codefendant Nick Nicholson, a general surgeon working at Baylor at the time.   Nicholson wanted to expand into bariatric surgery.   In approximately 2008, Nicholson began paying Level Two approximately $5,000 to $10,000 per month from his own funds to brand the Nicholson Clinic and advertise it on billboards.   The Nicholson Clinic's phone number, or a phone number that would route to the Clinic through a call center, appeared on the billboards.

In approximately late 2008, codefendant Michael Rimlawi contacted Level Two regarding marketing services.   Rimlawi and codefendant Douglas Won wanted to merge their practices into the Minimally Invasive Spine Institute (MISI).   They hired Level Two to brand MISI so patients would come directly to the surgery center as opposed to

being referred by their primary care doctors.    Rimlawi and Won each paid Level Two approximately $5,000 a month by personal credit card to market MISI.

Around that time, Rimlawi introduced Loter to codefendant Alan Beauchamp, who, along with others, was starting Forest Park Medical Center (FPMC).

Prior to FPMC's opening, Beauchamp, Nicholson, Loter, and an employee of Level Two met for dinner at the Mercury Grill.    Beauchamp wanted surgeons, particularly Nicholson, to bring high-end, elective out-of-network surgeries to FPMC. At the dinner, the parties discussed how many surgeries Nicholson was performing a month and how many of those surgeries he could bring to FPMC.    They agreed that, if Nicholson performed surgical cases at FPMC, FPMC would pay Level Two approximately $70,000 a month to market the Nicholson Clinic.    The conversation regarding Nicholson's payments was always about the number of surgeries he would perform at FPMC.    Once FPMC started paying to market the Nicholson Clinic, Nicholson ceased paying Level Two for his own marketing.    Nonetheless, Level Two advertised Nicholson and the Nicholson Clinic, not FPMC, which benefited Nicholson tremendously.

Beauchamp and Loter arranged the same type of deal with Rimlawi and Won regarding MISI.    At the time, Rimlawi and Won were taking their surgical cases to Pine Creek and Methodist Hospital.    Beauchamp, acting on behalf of FPMC, offered to fund MISI's marketing through Level Two in exchange for Rimlawi and Won's referring their surgical cases to FPMC, which they did.    According to Loter, FPMC was buying

surgical cases from MISI, specifically, Rimlawi and Won.   Once FPMC started funding MISI's marketing, Rimlawi and Won stopped paying Level Two to market MISI entirely. The MISI ads created by Level Two did not even mention FPMC; instead, they branded and advertised MISI, which Rimlawi and Won owned at the time.   Much later, a FPMC logo might have been added to some of the MISI ads, but the focus of the advertising—and the benefit derived—was always on/to MISI.

Beauchamp spoke with Loter about doing advertising for other doctors, including codefendants David Kim, Wade Barker, and other surgeons.   The agreement was always the same.   FPMC would pay for all or some of the surgeons personal marketing through Level Two in exchange for the surgeon bringing certain surgical cases to FPMC.   The more cases the surgeon could bring to FPMC, the more money they would receive. FPMC, acting through Beauchamp and others, paid Level Two $40,000 to $50,000 per month to market a doctor in exchange for the doctor agreeing to bring patients to FPMC. Similarly, FPMC, acting through Beauchamp and others, paid Level Two $25,000 per month to market another doctor in exchange for that doctor agreeing to bring patients to FPMC.   Beauchamp and Loter worked out a similar agreement with other doctors through Level Two.   Loter also knew that FPMC was paying other doctors directly for their patients.

Codefendant Andrea Smith, Beauchamp's assistant, tracked the number of surgeries each doctor brought to FPMC.   Loter was kept apprised of these tracking documents because the number of surgeries each surgeon brought determined how much

money they would receive the following month.    In general, Loter recalls Beauchamp paying approximately 10% of what FPMC could bill for the surgeries.    Rimlawi and Won in particular were very interested in knowing how much more money they could receive for bringing additional surgeries to FPMC.    They would ask these questions to Beauchamp and codefendant Mac Burt through Level Two, inquiring about the sliding scale for marketing payments.

Loter received checks from Unique Healthcare at first and then from Adelaide Business Solutions.    Loter was not sure what these entities were, but he knew that Beauchamp controlled the spending.    In fact, Beauchamp would tell Loter what companies to put on his invoices and the amount.    Loter would provide the doctors with documentation showing what Level Two had received from Adelaide on their behalf and how Level Two spent the money.    So the doctors knew precisely the benefit they were receiving in exchange for their patients.

Loter was concerned that it was illegal for FPMC to pay for doctors' marketing campaigns because he knew that Beauchamp and others expected surgeries in return for these payments and the doctors understood this.    But Loter had an incentive to assist Beauchamp in recruiting doctors for FPMC's bribe and kickback program because Level Two received a percentage of the payments that FPMC paid to Level Two for the doctors.

Loter knew that, in the vast majority of cases, it was against patients' financial interests for their surgeons to bring them to an out-of-network facility because the patient would owe substantial out-of-pocket costs.    But Loter generally understood that FPMC

Factual Resume – Page 5

was not collecting the patient-responsibility payment.

**FPMC'S EFFORTS TO SELL MEDICARE PATIENTS**

Loter was told that FPMC did not accept Medicare patients, yet the marketing he did generated Medicare beneficiaries for the doctors.   Beauchamp asked Loter to set up an arrangement to sell the leads of Medicare patients to a certain hospital.   Barker, Kim, and possibly Nicholson were all knowing participants in these efforts, and it was patients seeking the services of these doctors that they were trying to sell.   Loter, codefendant Carli Hempel, and others met with the CEO of the hospital to discuss selling Medicare referrals.   Hempel was in charge of negotiating the price-per-patient and ultimately struck a deal for $350 per referral, a deal that was shared with Kim, members of Barker's staff, and ultimately Barker.   Loter also drafted a Medicare referral protocol to explain to Kim, Barker, and their staffs how to refer Medicare beneficiaries that either called their offices for services or inquired about services over the internet to the hospital. Loter—who had little to no experience in the healthcare industry—knew that selling or attempting to sell Medicare referrals was wrong and illegal.

Loter knew that the purpose of Unique Healthcare and Adelaide Business Solutions was to make it appear as if FPMC was not paying doctors for their patients. Yet he accepted payments from those entities on behalf of multiple doctors knowing that Beauchamp and FPMC controlled the funds, all of which helped conceal the purpose of the payments.   In addition, Loter did not as soon as possible make known the federal crime of Conspiracy to Pay and Receive Health Care Bribes and Kickbacks to some judge

or other person in civil or military authority under the United States.

This factual resume is not intended to be a complete accounting of all the facts and events related to the offense charged in this case.   The limited purpose of this statement of facts is to demonstrate that a factual basis exists to support Loter's guilty plea to Count One of the Superseding Information.

AGREED TO AND SIGNED on this _____ 9th day of January 2017.

JOHN R. PARKER
UNITED STATES ATTORNEY


_____
ANDREW O. WIRMANI
Assistant United States Attorney


_____
KELLY LOTER
Defendant


_____
DAVID FINN
Attorney for Defendant